**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. GARY S. KATZMANN**

---------------------------------------------------------------------- X

**ETEROS TECHNOLOGIES USA, INC.,**                              :
                                                                :
               **Plaintiff,**                                   :
                                                                :
        ***v.***                                                :        **Case No. 25-cv-36-GSK**
                                                                :
**UNITED STATES OF AMERICA,**                                   :
                                                                :
                                                                :
               **Defendant.**                                   :

---------------------------------------------------------------------- X


<u>**PLAINTIFF'S MOTION FOR ENTRY OF AN EXPEDITED SCHEDULING**</u>
<u>**ORDER PURSUANT TO USCIT R. 3(g)**</u>

NEVILLE PETERSON LLP

Richard F. O'Neill
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

John M. Peterson
Patrick B. Klein
One Exchange Plaza at 55 Broadway
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

*Counsel to Plaintiff Eteros Technologies USA, Inc.*

Dated: January 31, 2025

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTS GIVING RISE TO THIS ACTION ..........................................................................5

ARGUMENT .........................................................................................................................10

I.  Plaintiff Satisfies the Rule 3(g)(5) Standard for Expediting this Action. .........................10

    A.  Failure to Expedite Would Result in Mootness or Deprive the Prospective Declaratory Relief of Much of Its Value. .............................................................10

    B.  Failure to Expedite Would Result in Continued Extraordinary Hardship to Plaintiff. .................................................................................................................11

        1.  Operational Disruption.............................................................................11

        2.  Financial Losses.......................................................................................12

        3.  Reputational Damage................................................................................13

        4.  Workforce Disruption. .............................................................................14

        5.  Legal and Strategic Implications. ............................................................15

    C.  Public Interest in the Interpretation and Enforcement of the Statute is Particularly Strong. ..............................................................................................16

II.  Additional Factors Strongly Favor Granting Plaintiff's Motion to Expedite. ..................19

CONCLUSION.......................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Eteros Technologies USA, Inc. v. United States*, 592 F. Supp. 3d 1313 (Ct. Int'l Tr. 2022). passim

*Harris v. Nelson*, 394 U. S. 286 (1969) ................................................................................ 10

*J.D. Irving, Ltd. v. United States*, 570 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ......................... 10

*Keirton USA, Inc. v. United States*, 627 F. Supp. 3d 1342 (Ct. Int'l Tr. 2023) .................... passim

*Ontario Forest Indus. Ass'n v. United States*, 444 F. Supp. 2d 1309 (Ct. Int'l Tr. 2006)........... 10

*Price v. Johnston*, 334 U.S. 266 (1948). ............................................................................... 10

*Shinyei Corp. of Am. v. United States*, 355 F.3d 1297 (Fed. Cir. 2004)...................................... 9

*United States v. New York Tel. Co*., 434 U.S. 159 (1977) ......................................................... 9

**Statutes**

19 U.S.C. § 1595a .................................................................................................................... 4

21 U.S.C. § 1907 ............................................................................................................. 3, 4, 18

21 U.S.C. § 841 .............................................................................................................. 3, 4, 18

21 U.S.C. § 863 ................................................................................................................. passim

28 U.S.C. § 1581 ..................................................................................................................... 9

28 U.S.C. § 1651 ..................................................................................................................... 9

28 U.S.C. § 2201 ..................................................................................................................... 9

7 U.S.C. § 1639o .................................................................................................................... 17

8 U.S.C. § 1101 ...................................................................................................................... 5

8 U.S.C. § 1182 ...................................................................................................................... 6

8 U.S.C. § 1229a ..................................................................................................................... 6

**Regulations**

19 C.F.R. § 177.9 .................................................................................................................... 3

8 C.F.R. § 214 ........................................................................................................................ 5

**Other Authorities**

Bruce Barcott and Beau Whitney, *The US Cannabis Industry Now Supports 428,059
    Jobs*, Leafly (Feb. 23, 2022; updated September 15, 2022)
    https://www.leafly.com/news/industry/cannabis-jobs-report. ................................................... 17

*Customs Headquarters Ruling H327540 of March 3, 2024* ............................................. 2, 4, 18

*Industry Statistics 2024 and What We Learned*, IndicaOnline (January 16, 2025)
    https://indicaonline.com/blog/industry-statistics-2024-and-what-we-learned/ (last
    visited Jan 29, 2025). ......................................................................................................... 17

*NY Ruling N340357 of June 18, 2024* ...................................................................................... 2

*See* Melanie Paige, *The State of Cannabis Legalization in 2024 and What to Expect in
    2025*, MyCannabis (Dec. 31, 2024) https://www.mycannabis.com/the-state-of-
    cannabis-legalization-in-2024-and-what-to-expect-in-2025/. ................................................... 17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. GARY S. KATZMANN
-------------------------------------------------------------------- X

ETEROS TECHNOLOGIES USA, INC.,                    :
                                                  :
           Plaintiff,                             :
                                                  :
    v.                                            :      Case No.  25-cv-36-GSK
                                                  :
UNITED STATES OF AMERICA,                         :
                                                  :
                                                  :
           Defendant.                             :
-------------------------------------------------------------------- X

## PLAINTIFF'S MOTION FOR ENTRY OF AN EXPEDITED SCHEDULING ORDER PURSUANT TO USCIT R. 3(g)

In accordance with Rules 1, 3(g), 7 and 26 of the Rules of the United States Court of International Trade, Plaintiff, ETEROS TECHNOLOGIES USA, INC., ("Plaintiff" or "Eteros"), by and through undersigned counsel, respectfully moves this Court for entry of an expedited scheduling order pursuant to Rule 3(g) of the Rules of the U.S. Court of International Trade (USCIT R.). As provided herein and as supported by the annexed Declaration of Aaron McKellar, Eteros CEO ("McKellar Declaration"), and the annexed Declaration of Amanda James, Eteros Director of Strategy and Business Development ("James Declaration"), good cause exists to grant this Motion.

## INTRODUCTION

Three-and-one-half years ago, Eteros Technologies USA, Inc. ("Eteros" or "Plaintiff") came before this Court to test the scope of the federal authorization exemption in 21 U.S.C. § 863(f)(1). [1] CBP had excluded from entry a shipment of Eteros' motor frame assemblies for its

---

[1] 21 U.S.C. § 863(f)(1) provides:

(f) Exemptions

Mobius M108S agricultural trimmer, alleging that the assemblies constituted prohibited "drug paraphernalia" under the Mail Order Drug Paraphernalia Act, 21 U.S.C. § 863(d) and constituted an unlawful "import [of] drug paraphernalia in violation of 21 U.S.C. § 863 (a)(3). For purposes of the litigation, Eteros stipulated that the subject merchandise met the broad statutory definition of "drug paraphernalia" under 21 U.S.C. § 863(d), but argued—and this Court agreed—that its activities fell squarely within the exemption provided by § 863(f)(1) because the conduct contemplated by § 863(f)(1) is authorized under Washington State law. *Eteros Technologies USA, Inc. v. United States*, 592 F. Supp. 3d 1313 (Ct. Int'l Tr. 2022).

The *Eteros* decision confirmed the legality of Plaintiff's import activities, making clear that imports of cannabis-related merchandise authorized by State law were not unlawful, but in fact entirely licit and admissible into the United States. This Court has now twice held that the importation of cannabis-related equipment is lawful under 21 U.S.C. §863(f)(1) by virtue of Washington State law authorizations. *See e.g., Eteros, supra*; *Keirton USA, Inc. v. United States*, 627 F. Supp. 3d 1342 (Ct. Int'l Tr. 2023). Defendant did not appeal either CIT ruling; and indeed, CBP Headquarters acquiesced in them, acknowledging in *Customs Headquarters Ruling H327540 of March 3, 2024* that "drug paraphernalia that is destined for states that have legalized cannabis may be exempted under 21 U.S.C. § 863(f)(1)."[2]

---

This **section** shall not apply to—

(1) any **person authorized** by local, State, or Federal law to manufacture, possess, or distribute such items …

[2] CBP has repeatedly found cannabis-related "drug paraphernalia" to be admissible. *See Customs Headquarters Ruling 327540 of March 3, 2024; see also*, *NY Ruling N340357 of June 18, 2024* ("[T]he subject products meet the definition of marijuana-related 'drug paraphernalia' under 21 USC § 863(d), the importation of which is prohibited under 21 USC § 863(a)(3). However, in *Eteros Technologies USA, Inc. v. United States*, 592 F. Supp. 3rd 1313 (Ct. Int'l Trade 2022), and *Keirton USA Inc. v. United States*, 600 F. Supp. 3rd 1270 (Ct. Int'l Trade 2022), the

Now, in defiance of this Court's decisions and contrary to its own Ruling, CBP has taken the position that importers conducting the activities approved by this Court in *Eteros* and *Keirton* – *without more* – are guilty of "illicit drug trafficking" in violation of 21 U.S.C. § 1907[3] and "aiding and abetting" the distribution or dispensing of a controlled substance, in violation of 21 U.S.C. § 841(a).[4]

Thus, unable to act against the imported merchandise, Customs has taken action against Eteros' executives, for doing nothing more than engaging in the activity which this Court found to be lawful. As noted in the Complaint, CBP has excluded two top Eteros executives from the United States and prohibited them from re-entering the country to supervise the lawful business operations of Plaintiff Eteros. CBP's own words indicate that the agency's actions are taken in reaction to this Court's *Eteros* decision.

CBP's allegations are part of an apparent effort to strike back against Eteros for its prior victory on the issue in the CIT and to deter future litigants from asserting their rights as "persons authorized" under § 863(f)(1).

---

Court of International Trade held that importers importing marijuana-related drug paraphernalia through a port where individuals are 'authorized' by the state to possess such items, within the meaning of the exemption in 21 USC § 863(f)(1), and are therefore exempt from this prohibition."). Customs rulings: "represent[] the official position of the Customs Service with respect to the particular transaction or issue described therein and is binding on all Customs Service personnel in accordance with the provisions of this section until modified or revoked." 19 C.F.R. § 177.9(a).

[3] 21 U.S.C. § 1907 defines "narcotics trafficking," providing:

The term "<u>narcotics trafficking</u>" means **any illicit activity** to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or to assist, abet, conspire, or collude with others to do so.

[4] 21 U.S.C. § 841(a) deems it unlawful to knowingly or intentionally, "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," or to aid an abet another's violation.

3

Just as this Court's *Eteros* and *Keirton* decisions settled the relationship of State-authorized importers and Customs with respect to 21 U.S.C. § 863(f)(1), this Declaratory Judgment action asks the Court to clarify and settle that relationship with respect to other provisions of Title 21, specifically 21 U.S.C. §§ 1907 and 841. While *Eteros* and *Keirton* required the Court to interpret 21 U.S.C. § 863, this action calls upon the Court to administer and enforce those judgments by defining the broader legality of the importing activities this Court has previously upheld. Plaintiff submits the Court already answered this question, particularly because the Court held the importation is not "contrary to law" under 19 U.S.C. § 1595a(c)(2)(A).[5]

Plaintiff asks this Court to issue a Declaratory Judgment concerning whether Plaintiff and other persons engaged in the activity approved by this Court in *Eteros* and *Keirton*—and by CBP in *Customs Headquarters Ruling H327540 of March 3, 2024,* may, <u>without more</u>, be deemed to have engaged in illicit narcotics trafficking in violation of 21 U.S.C. § 1907, or in "aiding and abetting" the manufacture of a controlled substance, in violation of 21 U.S.C. § 841. Plaintiff submits that both questions must be answered in the negative.

Expedited hearing of this cause is essential to resolve the legal uncertainties created by CBP's defiance of this Court's Article III powers and the reach of its national jurisdiction, its prior judgments and orders, and to prevent further harm to Eteros, its employees, and its business operations caused by Defendants' misapplication of the law.

---

[5] Obviously, if importing pursuant to § 863(f)(1) is *per se* aiding and abetting narcotics trafficking, then the importation would clearly be "contrary to law" under 21 U.S.C. §§ 1907 and 841. This Court's finding that the importations are lawful under § 1595a(c)(2)(A) requires that it issue declaratory relief to define—once and for all—the lawful parameters of the importing activities this Court has previously upheld.

## FACTS GIVING RISE TO THIS ACTION

As noted in the Complaint, *see* ECF 2, when Eteros' Director of Strategy & Business Development, Amanda James, a Canadian national who had for three years prior held L-1A[6] work authorization, permitting her to work in the United States for Plaintiff, approached CBP officers at the Port of Blaine, Washington to renew her L-1A visa, she was taken to an interrogation room for secondary inspection and questioned extensively regarding her employment by Eteros. When the interrogation concluded, Ms. James was told that the application to extend her visa had been denied, that she was to return to Canada, and that she would be criminally prosecuted for her activities for plaintiff, if she attempted to return to the United States. Fearful of possible arrest and prosecution, Ms. James has since remained in Canada, attempting to work remotely, but unable to perform the full duties of her job with Plaintiff which require her frequent physical presence in the United States. *See e.g.,* James Declaration, at ¶¶ 4-10.

As further detailed in the Complaint, *see* ECF 2, not long after, when Plaintiff's CEO, Aaron McKellar, a Canadian national, entered the United States on personal business (to shop at a Trader Joe's store in Bellingham, WA), he was also detained and interrogated by CBP officers performing immigration duties at the port of Blaine, WA (coincidentally the same port at issue in *Eteros* and *Keirton*). Mr. McKellar was intensively interrogated concerning his work with Plaintiff, and was asked numerous times about "the Court case," which he understood to refer to this Court's

---

[6] L-1A work authorization allows multinational companies to transfer executives or managers to the United States under 8 U.S.C. § 1101(a)(15)(L). For Canadian citizens, the process begins with an application submitted directly to CBP at a designated port of entry or preclearance location. *See* 8 C.F.R. § 214.2(l)(17). CBP conducts an initial review and issues a recommendation to approve or deny the application. However, U.S. Citizenship and Immigration Services (USCIS) retains final adjudicatory authority over L-1A petitions, and its approval is required to confer the status. Once an L-1A visa or status is granted by USCIS, CBP retains the authority to inspect and verify compliance with the terms of the approved petition during each entry into the United States.

decision in *Eteros*. When the questioning turned, Mr. McKellar attempted to withdraw his application for entry and return to Canada. This was (unlawfully[7]) refused, CBP issued an Expedited Removal Order ("ERO") returning him to Canada, *see* Complaint Exhibit A, and issued a five (5) year ban on his re-entry into the United States. *See e.g.,* McKellar Declaration, at ¶¶ 3-13.

Mr. McKellar, through counsel, appealed the ERO and entry ban. *See* Reconsideration Request, Complaint Exhibit B; *see also,* McKellar Declaration at ¶ 13. In a decision letter dated November 12, 2024, *see* Denial Determination, Complaint Exhibit C, CBP Area Port Director for the Port of Blaine, WA, Harmit S. Gill, denied Plaintiff's Reconsideration Request in full, stating:

> [Eteros CEO Mr. Aaron McKellar] was found inadmissible under section
> 212(a)(2)(C)(i) of the INA[8] due to the involvement of the Eteros Technologies

---

[7] CBP violated a number of immigration laws and internal CBP policies in their October 4, 2024 encounter with Mr. McKellar, including the deprivation of statutory safeguards guaranteed by formal removal proceedings under 8 U.S.C. § 1229a, which include a meaningful opportunity to be heard before an immigration law judge. These specific constitutional due process violations and violations of law are not directly relevant to the instant case or Motion, and are the subject of a separate action before the U.S. District Court for the Western District of Washington. *See Eteros Technologies USA, Inc. v. United States, et al.*, WAWD Case No. 25-181.

[8] INA 212(a)(2)(C)(i), 8 U.S.C. § 1182(a)(2)(C)(i), provides:

§ 1182. Inadmissible aliens
   (a) Classes of aliens ineligible for visas or admission.
      Except as otherwise provided in this chapter, aliens who are inadmissible
      under the following paragraphs are ineligible to receive visas and ineligible
      to be admitted to the United States:
            *         *         *
      (2) Criminal and related grounds
            *         *         *
      (C) Controlled substance traffickers
      Any alien who the consular officer or the Attorney General knows or
      has reason to believe-
      (i) is or has been an illicit trafficker in any controlled substance or in
      any listed chemical (as defined in section 802 of title 21), or is or has
      been a knowing aider, abettor, assister, conspirator, or colluder with
      others in the illicit trafficking in any such controlled or listed substance
      or chemical, or endeavored to do so; or

USA, Inc in the production of marijuana and the proliferation of the marijuana industry, which results in <u>reason to believe that employees of the organization are engaged in narcotics trafficking and inadmissible under section 212(a)(2)(C)(i) of the INA</u>.

The petitioning entity, of which Mr. McKellar is an owner, Eteros Technologies USA, Inc. manufactures and sells harvesting equipment for the hemp and cannabis industry. Their products include the Mobius Cannabis Automation suite, MBX Bucker, M108S Trimmer, M9 Sorter, conveyors, and M210 and M60 Mills, all of which are manufactured and marketed for use in the cannabis and marijuana industries. The customers shown on the Mobius Trimmer website include marijuana dispensaries.

Under Title 21 USC 1907 Narcotics Trafficking is defined as "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or assist, abet, conspire, or collude with others to do so".

The legal definition of "aid and abet" is, "assist someone in committing or to encourage someone to commit a crime".

Under Title 21 USC 841 it is unlawful to knowingly or intentionally, "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance".

Denial Determination, Complaint Exhibit C. Port Director Gill continues:

Under the regulations and definitions contained within Title 21, the petitioning entity, Eteros Technologies USA, Inc., and the beneficiary, Mr. McKellar, are <u>encouraging, promoting and assisting in the production of marijuana for the purpose of distributing and dispensing and thus, are aiding and abetting the narcotics trafficking of marijuana in the United States in violation of 21 USC 841</u>.

In the lawsuit *Eteros Technologies USA, Inc. v. United States* argued before the United States Court of International Trade (CIT), the <u>petitioning entity stipulated for the purpose of the litigation that the merchandise</u> which they were importing into the United States for distribution to their customers, <u>satisfies the federal statutory definition of "drug paraphernalia"</u>. **While the ruling in this lawsuit was in favor of Eteros Technologies USA, Inc., it did not determine their business**

---

(ii) is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity,

is inadmissible.

> **was outside the scope of federally illegal marijuana production, it simply granted them an exemption from the importation prohibitions in Title 21 USC 863.** This ruling solely addressed the import restrictions associated with marijuana drug paraphernalia. 21 USC 863, and in particular, 21 USC 863(f), has no basis on the federal legality or immigration consequences pertaining to an individual's involvement in the marijuana industry by a noncitizen. <u>By stipulating[9] that their products are drug paraphernalia, Eteros Technologies USA, Inc. has demonstrated that they are knowingly and intentionally contributing to the proliferation of the marijuana industry in the United States and are therefore in violation of 21 USC 841.</u> The **CIT is a court of limited jurisdiction** and **lacks authority to set precedent over U.S. immigration law**. The CIT ruling does not form a basis to argue that Mr. McKellar is admissible in states that have legalized marijuana.

Denial Determination, Complaint Exhibit C [emphasis added]. CBP's position and actions taken pursuant thereto—which, to be clear, go well beyond Mr. McKellar and Ms. James and significantly impact and harm Eteros' other employees[10]—seek to punish Eteros for engaging in the very activities this Court has deemed licit and lawful. *See e.g., Eteros Technologies USA, Inc. v. United States*, 592 F. Supp. 3rd 1313 (Ct. Int'l Trade 2022). Defendant's actions undermine the enforceability of this Court's judicial decisions, jeopardize Eteros' ability to conduct its lawful business, and deliberately chill future litigants from pursuing legitimate claims against CBP in this Court.

    To be clear, <u>Plaintiff is not requesting that this Court provide any specific relief related to any immigration decision or action against Plaintiff, Mr. McKellar, or other affected Eteros</u>

---

[9] Eteros stipulated for purposes of litigation that the subject merchandise met the broad definition of "drug paraphernalia" under the Mail Order Drug Paraphernalia Act, 21 U.S.C. § 863(d), but argued that its goods were exempt from the § 863(a) prohibitions because the conduct contemplated by the federal authorization exemption, 21 U.S.C. § 863(f)(1), is authorized under the laws of the State of Washington—namely, *possession*, *distribution* or *manufacture* of cannabis-related "drug paraphernalia." *See e.g.,* Court No. 21-00287 (GWK), ECF 4 at ¶¶ 10, 14, 15, 27 and 31; *see also, Eteros, supra, at n.4* ("Eteros has stipulated **for the purposes of this litigation** that its merchandise qualifies as "drug paraphernalia" under § 863(d). *See* Pl.'s Br. at 1. As such, the court need not parse the federal definition." (emphasis added)).

[10] *See* McKellar Declaration, at ¶¶ 20(g), 23, 25; James Declaration, at ¶¶ 10, 14, 15, 19.

executives and employees. Nor does Plaintiff invite this Court's interference with CBP's immigration enforcement powers or the specific actions taken against Eteros executives, which are being challenged separately in a proceeding before the federal district court for the Western District of Washington, Case No. 25-181.

Instead, Plaintiff seeks declaratory relief from this Court (i) to clarify the legal relationship between Eteros' import activities under 21 U.S.C. § 863(f)(1)—as previously adjudicated by this Court and deemed lawful—and the other portions of Title 21 involving narcotics trafficking implicated by CBP's actions against Eteros; and (ii) to protect this Court's jurisdiction and authority from an agency—or at best, an obstinate Area Port Director—that has openly defied this Court's rulings, refused to acknowledge this Court's authority or national jurisdiction, and refused to accede to this Court's prior judgments and orders.

This Court maintains jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(D).[11] Declaratory relief is sought under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the All Writs Act, 28 U.S.C. § 1651, is invoked to aid this Court's jurisdiction under § 1581(i)(4).[12]

---

[11] This Court maintains jurisdiction under 28 U.S.C. § 1581(i)(1)(D), which provides for jurisdiction over civil actions arising out of laws concerning the "administration and enforcement" of trade-related matters, including prior judgments of the Court. In this case, the Court's earlier decision in *Eteros, supra,* was issued pursuant to the Court's jurisdiction under 28 U.S.C. § 1581(a). The Defendants' disregard of that judgment and subsequent conduct undermining its effect implicates the "administration and enforcement" of the Court's prior ruling, thereby falling squarely within the ambit of § 1581(i)(1)(D). *See Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1304-05 (Fed. Cir. 2004) (holding that § 1581(i)(4) encompasses actions concerning the proper enforcement of prior judicial decisions involving trade matters).

[12] The All Writs Act, 28 U.S.C. § 1651, empowers courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." While the Act does not provide an independent basis for jurisdiction, it is a critical procedural tool that allows courts to protect their established jurisdiction and ensure the enforcement of their judgments. In this case, the All Writs Act is invoked to aid the Court's jurisdiction under 28 U.S.C. § 1581(i)(1)(D) by ensuring the administration and enforcement of its prior ruling in Eteros. *See United States v. New York Tel. Co.*, 434 U.S. 159, 172-74 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may

## ARGUMENT

Good cause exists to grant the instant Motion for entry of an expedited schedule in this action.

## I.    Plaintiff Satisfies the Rule 3(g)(5) Standard for Expediting this Action.

Rule 3(g)(5) of the Rules of the U.S. Court of International Trade permits the Court to expedite any "action that the court determines, based on motion and for good cause shown, warrants expedited treatment." This Court has established that "good cause" exists to expedite the briefing and consideration of an action:

> (1) in a case in which failure to expedite would result in mootness or deprive the relief requested of much of its value, (2) in a case in which failure to expedite would result in extraordinary hardship to a litigant, or (3) actions where the public interest in enforcement of the statute is particularly strong.

*Ontario Forest Indus. Ass'n v. United States*, 444 F. Supp. 2d 1309, 1319 (Ct. Int'l Tr. 2006) (citations omitted); *see also J.D. Irving, Ltd. v. United States*, 570 F. Supp. 3d 1349 (Ct. Int'l Trade 2022). Plaintiff's Motion satisfies each of these prongs—even though, satisfying any one factor is sufficient for the expedited schedule to be issued—as demonstrated below.

### A.    Failure to Expedite Would Result in Mootness or Deprive the Prospective Declaratory Relief of Much of Its Value.

CBP's unlawful actions have already caused significant harm to Eteros and its executives, as detailed above and in the appended declarations. Without expedited treatment, Eteros will continue to face operational disruption, financial losses, reputational harm, and erosion of employee morale. The prolonged inability of Eteros' senior personnel to oversee U.S. operations

---

be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained: "This statute has served since its inclusion, in substance, in the original Judiciary Act as a 'legislatively approved source of procedural instruments designed to achieve 'the rational ends of law.''" *Harris v. Nelson*, 394 U. S. 286, 299 (1969), quoting *Price v. Johnston*, 334 U.S. 266, 282 (1948)." (emphasis added)).

creates a leadership vacuum that compounds these harms, threatening Eteros' ability to remain viable in the United States market.

**B.    Failure to Expedite Would Result in Continued Extraordinary Hardship to Plaintiff.**

The harms inflicted upon Eteros by CBP's targeted actions are both immediate and multifaceted, creating operational, financial, reputational, and workforce-related challenges. These hardships, detailed below, justify expedited treatment to mitigate further damage and ensure the company's ability to continue its lawful operations.

**1.    Operational Disruption.**

The absence of key personnel from Plaintiff's operations in the United States, including Eteros' CEO, Mr. Aaron McKellar, and its Director of Strategy and Business Development, Ms. Amanda James, has created significant operational challenges in the United States. Both executives play vital roles in overseeing the company's U.S. operations, ensuring compliance with regulatory requirements, and maintaining critical relationships with customers and stakeholders. As detailed in the appended declarations of Eteros' executives, without their physical presence in the United States, Plaintiff Eteros has been unable to:

- Oversee day-to-day operations and resolve operational issues at its Las Vegas facility, leading to inefficiencies and delays. *See* McKellar Declaration, at ¶¶ 20(e), 20(f) (discussing avoidable inventory shortages that have led to lost sales and other operational inefficiencies); James Declaration, at ¶¶ 12-13 (describing operational challenges from inability to supervise U.S.-based employees and noting specific operational disruptions).

- Engage in hands-on supervision and training of U.S.-based staff, resulting in missed opportunities to onboard new employees effectively. *See* McKellar Declaration, at ¶¶ 20(c)-(d) (detailing recruitment challenges, stalled onboarding efforts, and insufficient

training of new hires leading to reduced productivity); James Declaration, at ¶¶ 14-15 (highlighting delays in onboarding and training of U.S.-based employees and the impact on service quality and customer satisfaction).

- Provide in-person support and leadership at industry events, diminishing Eteros' visibility and influence in the marketplace. *See* McKellar Declaration, at ¶¶ 20(b), 20(g) (discussing absence from key industry events like MJBizCon 2024 and Demo in the Desert, leading to reputational harm and misperceptions about Eteros' financial stability); James Declaration, at ¶¶ 16, 19 (emphasizing the negative impressions caused by absence at key events and the resulting harm to customer trust and industry relationships).

This leadership vacuum directly affects Eteros' ability to maintain operational efficiency and achieve its strategic objectives.

### 2. Financial Losses.

The financial repercussions of CBP's actions are substantial and growing. As detailed in the appended declarations of Eteros' executives, Eteros has already suffered direct and indirect losses, including:

- <u>Missed Sales Opportunities</u>: Inventory mismanagement and the inability to maintain consistent operations at the Las Vegas facility have resulted in significant lost sales, totaling around $115,000 to date. *See* McKellar Declaration, at ¶¶ 20(e), 20(f) (discussing inventory mismanagement and operational inefficiencies at the Las Vegas facility resulting in lost sales); James Declaration, at ¶¶ 12-13 (noting operational disruptions caused by the absence of leadership and the resulting impact on sales).

- <u>Increased Costs</u>: Eteros has been forced to rely on expensive contract services to fill gaps in operational leadership and marketing functions, as the absence of executives like Ms.

James has left critical roles unfulfilled. *See* McKellar Declaration, at ¶ 20(d) (highlighting the use of contract services to address leadership gaps due to the absence of senior executives); James Declaration, at ¶¶ 14-15 (describing reliance on temporary staffing solutions and associated increased costs caused by delays in recruiting and onboarding permanent personnel).

- <u>Customer Attrition</u>: The inability to provide personalized service and reassurance to key customers has increased the risk of losing long-term business relationships. *See* McKellar Declaration, at ¶¶ 20(a), 20(h) (discussing increased risks to customer retention and reputational harm due to the inability to provide in-person service and leadership); James Declaration, at ¶¶ 16-17 (emphasizing how the absence of executives has strained customer relationships and increased dissatisfaction among key clients).

These financial harms threaten Eteros' bottom line and jeopardize its ability to invest in future growth and innovation.

### 3. Reputational Damage.

CBP's baseless accusations of "aiding and abetting narcotics trafficking" have caused severe reputational harm to Eteros. This damage is particularly pronounced in a new and highly competitive industry where trust and credibility are paramount. As detailed in the appended declarations of Eteros' executives, specific harms flowing to Eteros as a result of CBP's actions, include:

- <u>Loss of Customer Confidence</u>: Eteros' executives' absence at key industry events, such as MJBizCon 2024 and Demo in the Desert, has led to speculation about the company's financial stability and commitment to customers in the industry. *See* McKellar Declaration at ¶ 20 (discussing absence at key events, customer misperceptions, and reputational harm);

James Declaration at ¶¶ 13, 16 (discussing absence at MJBizCon and Demo in the Desert, operational impacts, and customer perceptions).

- <u>Erosion of Industry Relationships</u>: The stigma associated with CBP's allegations has strained relationships with suppliers, partners, and potential investors, many of whom are hesitant to associate with a company perceived as under scrutiny. *See* McKellar Declaration at ¶¶20(h), 23, and 25 (discussing reputational harm and hesitation from industry stakeholders to engage with Eteros); James Declaration at ¶¶16-17, 19 (detailing harm to professional reputation, strained relationships, and lost business opportunities).

- <u>Market Positioning</u>: Competitors have seized on Eteros' challenges, attempting to fill the void created by its inability to engage fully in the U.S. market. *See* McKellar Declaration at ¶¶ 20 and 25 (highlighting operational and reputational challenges, and the competitive disadvantage caused by CBP's actions); James Declaration at ¶¶ 13-14, 19 (addressing operational inefficiencies, challenges in customer engagement, and competitors leveraging the situation).

This reputational harm has long-term implications, as it undermines Eteros' ability to attract new customers and retain existing ones.

### 4. Workforce Disruption.

The uncertainty surrounding CBP's actions has created a climate of anxiety and mistrust among Eteros' employees. As detailed in the appended declarations of Eteros' executives, this has manifested in several types of harms to Eteros, including:

- <u>Employee Retention</u>: Current employees, both in Canada and the United States, are increasingly concerned about their own exposure to retaliatory actions by CBP, including the potential for felony prosecution. *See* McKellar Declaration, at ¶¶ 20, 23 (discussing

concerns among employees about reputational harm and the stigma associated with CBP's actions); James Declaration, at ¶¶ 10, 17, 19 (highlighting concerns over baseless accusations of narcotics trafficking and their impact on professional standing, employee retention, and morale).

- <u>Recruitment Challenges</u>: Eteros has struggled to attract top talent, as prospective employees perceive the company as embroiled in legal and regulatory challenges. *See* McKellar Declaration, at ¶¶ 20 (discussing recruitment issues and the chilling effect on business activities caused by CBP's actions); James Declaration: ¶¶ 14-15 (addressing delays in recruitment, the resignation of a key U.S.-based executive, and difficulties attracting new talent).

- <u>Declining Morale</u>: The uncertainty about the future of Eteros' operations and the absence of key leaders have contributed to declining morale, further affecting productivity and engagement. *See* McKellar Declaration, at ¶¶ 20(g), 25, and 18 (discussing declining morale due to reputational harm, operational challenges, and CBP's actions); James Declaration, at ¶¶ 12-13, 15 (detailing operational inefficiencies, employee conflicts, and the inability to adequately train and support U.S.-based employees).

If not addressed, these workforce disruptions could result in attrition and a weakened organizational culture, compounding the challenges Eteros faces.

## 5. Legal and Strategic Implications.

CBP's actions have placed Eteros in a precarious legal and strategic position. The company's inability to rely on predictable enforcement of customs laws, despite prior rulings from this Court (obtained at great risk and expense to the company), undermines its ability to plan and execute business strategies. *See* McKellar Declaration, at ¶¶ 7-8, 18, and 26 (discussing the legal

and strategic challenges posed by CBP's disregard for judicial precedent and its impact on Eteros' ability to operate effectively); James Declaration, at ¶¶ 11, 19-20 (emphasizing the disruption caused by CBP's unpredictable enforcement actions and their impact on Eteros' strategic planning). Furthermore, the ongoing litigation and the uncertainty surrounding CBP's intentions have diverted valuable resources from innovation and market expansion to litigation and regulatory compliance efforts, further straining Eteros' ability to compete effectively in the U.S. market. *See* McKellar Declaration, at ¶¶ 20(a)-(g) (detailing resource allocation challenges and market disadvantages caused by CBP's actions); James Declaration, at ¶¶ 12-16 (describing the operational inefficiencies and financial impact stemming from Eteros' inability to focus on growth and development).

C.    **Public Interest in the Interpretation and Enforcement of the Statute is Particularly Strong.**

The third basis for expedition in USCIT R. 3(g)(5) is also present. Public interest in interpretation and enforcement of 21 U.S.C. § 863 is particularly strong. This includes the interpretation of the statute as set forth in this Court's *Eteros* and *Keirton* decisions. It also involves the enforcement of the statute, especially CBP's enforcement of the statute by using admissions of activity which this Court has held lawful under 21 U.S.C. § 863(f)(1) as a basis of charging persons engaged in such lawful activity—*without more*—with criminal narcotics trafficking. If you can't stop the importation of marijuana equipment into states which have legalized marijuana by excluding and seizing the equipment, CBP reckons, it can do so by accusing the importers of drug trafficking, and taking action against the importers on that basis—whether by deporting and excluding them (action taken in the case of Mr. McKellar), threatening them with criminal prosecution (as in the case of Ms. James), or actually seeking to prosecute and jail them.

As of 2022, when the *Eteros* and *Keirton* decisions were issued, the legal cannabis industry

in the United States supported 428,059 jobs.[13] Recent years have seen increased legalization of marijuana in the United States.[14] Legal and state-taxed sales of marijuana in 2024 topped $31.4 billion (with $1 billion in sales in New York State in its first year of legalization), poised to grow to $39 billion.[15]

Aside from marijuana, the 2018 Farm Bill legalized hemp[16] cultivation nationwide, but individual states retained the authority to regulate or prohibit its production within their jurisdictions. "By mid-2019, 47 States had passed legislation to allow some form of hemp production and planted acreage reported to the USDA Farm Service Agency increased from zero

---

[13] *See* Bruce Barcott and Beau Whitney, *The US Cannabis Industry Now Supports 428,059 Jobs*, Leafly (Feb. 23, 2022; updated September 15, 2022) https://www.leafly.com/news/industry/cannabis-jobs-report. (last visited Jan 29, 20205)

The Leafly report indicates:

Those 428,059 jobs include direct cannabis jobs like cultivation and retail sales—what are often called "plant-touching jobs"—as well as indirect ancillary jobs that serve licensed companies or depend on legal cannabis sales. Ancillary jobs include work in accounting, human resources, legal affairs, regulatory compliance, security, maintenance, and construction. Also included are indirect jobs in cannabis media, technology platforms, public relations, lobbying, non-cannabis product suppliers, and industry associations.

[14] *See* Melanie Paige, *The State of Cannabis Legalization in 2024 and What to Expect in 2025*, MyCannabis (Dec. 31, 2024) https://www.mycannabis.com/the-state-of-cannabis-legalization-in-2024-and-what-to-expect-in-2025/. (last visited January 29, 2025).

[15] *Industry Statistics 2024 and What We Learned*, IndicaOnline (January 16, 2025) https://indicaonline.com/blog/industry-statistics-2024-and-what-we-learned/ (last visited Jan 29, 2025).

[16] "Hemp," defined in 7 U.S.C. § 1639o(1) as Cannabis sativa L. with a delta-9-tetrahydrocannabinol (THC) concentration of no more than 0.3% on a dry weight basis, serves diverse industrial purposes based on its components. *Bast fiber*, from the stalk's outer layer, is durable, absorbent, and antimicrobial, making it ideal for rope, textiles, insulation, and bioplastics. *Hurd fiber*, from the stalk's core, is lightweight and absorbent, used in hempcrete, bedding, paper, and fiberglass. *Hemp seeds*, rich in protein and essential amino acids, are processed into foods, oils, biofuels, and paints. *Hemp flowers*, rich in cannabinoids like CBD and CBG, are extracted for pharmaceuticals, nutraceuticals, and consumables, showcasing hemp's broad utility.

in 2013 to 32,464 in 2018 to 146,065 in 2019."[17] As of January 2025, Idaho is the only state where hemp cultivation remains illegal. Cannabis processing equipment, such as that manufactured and imported by plaintiff, is essential to the industry.[18]

The legal cannabis industry's operations depend significantly on the lawful importation of cannabis processing equipment. Eteros' importation practices fully comply with 21 U.S.C. § 863(f)(1) and remain consistent with the facts examined and upheld in this Court's rulings in *Eteros* and *Keirton*. Ensuring this lawful activity proceeds without the threats of felony prosecution, imprisonment, deportation, or other penalties is essential. Consequently, the interpretation and enforcement of the laws under Title 21 by this Court[19] is a matter of substantial public interest, warranting the establishment of an expedited scheduling order to govern this litigation.

---

[17]   *See* United States Dep't Agriculture, Economic Research Service, U.S. Acres Planted With Industrial Hemp Expanded Rapidly In 2019 (March 4, 2020), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=96988 (last visited January 29, 2025).

[18]   *See 20 Products Every Professional Cannabis Facility Needs in 2024,* Green Vault Systems*,*    https://greenvaultsystems.com/products-every-professional-cannabis-cultivation-facility-needs/. (last visited January 29, 2025).

[19]   It is inconceivable that the CIT would have ruled as it did without addressing whether compliance with § 863(f)(1) might simultaneously subject importers to criminal liability under other provisions of Title 21, such as §§ 841 and 1907. If Port Director Gill's theory were correct, the CIT's rulings would render lawful importers like Eteros vulnerable to criminal prosecution, creating a paradoxical legal framework that undermines the predictability of customs enforcement. The CIT's silence on such a fundamental issue serves to further confirm that compliance with § 863(f)(1) precludes criminal liability under other provisions of Title 21 when the only conduct alleged is that relating to the merchandise imported *lawfully* pursuant to § 863(f)(1).

Also undermining such predictability is Customs Headquarters' Ruling *Customs Headquarters Ruling H327540 of March 3, 2024*, which invites importers to direct cannabis-related "drug paraphernalia" to a "destin[ation in] states that have legalized cannabis."

**II.    Additional Factors Strongly Favor Granting Plaintiff's Motion to Expedite.**

Other factors support issuance of an expedited litigation schedule in this case. First, the case turns largely on facts and legal principles previously addressed by this Court in the *Eteros* and *Keirton* decisions. Second, the issues in this case are purely legal issues, and require no evidentiary discovery—merely statutory interpretation.

The parties should be able to address the issues framed by the Complaint quickly and completely. If defendant has any jurisdictional or procedural objections, those can be briefed concurrently with the merits.

## CONCLUSION

For the foregoing reasons, and as supported by the appended declarations of Plaintiff's executives, Plaintiff respectfully requests that this Court grant its Motion for entry of an expedited scheduling order in this action.

Respectfully submitted,

NEVILLE PETERSON LLP

/s/ Richard F. O'Neill
Richard F. O'Neill
701 Fifth Ave., Ste. 4200-2159
Seattle, WA 98104-4089
(206) 905-3648
roneill@npwny.com

/s/ John M. Peterson
John M. Peterson
Patrick B. Klein
One Exchange Plaza at 55 Broadway
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

*Counsel to Plaintiff, Eteros Technologies USA, Inc.*

Dated: January 31, 2025